AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
AUG 28 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Black Cellphone
FPF No. 2019250400185501, line item 0003

Case No. **19MJ3648**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the  Southern  District of  California , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 952, 960, and 963 | Importation of controlled substances and conspiracy |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Edgar Aguirre, SA, Dept. of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Aug. 28, 2019

*Judge's signature*

City and state: San Diego, CA

Hon. Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Black Cellphone
>FPF No. 2019250400185501, line item 0003
>**(Target Device)**;



The **Target Device** is currently in the possession of the Department of Homeland Security, U.S. Customs and Border Protection Permanent Vault at 9495 Customhouse Plaza in San Diego, CA, 92154.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 22, 2019 to July 20, 2019:

a. tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.**

# AFFIDAVIT

I, Edgar Aguirre, Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic device, as further described in Attachment A (the **Target Device**), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952, 960, and 963, as more particularly described in Attachment B:

   a. Black Cellphone
   FPF No. 2019250400185501, line item 0003
   **(Target Device)**;

This search supports an investigation and prosecution of MARIANA HARO for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Device** was seized from a vehicle driven by HARO on July 19, 2019, at the time of her arrest at the San Ysidro, California Port of Entry ("POE"), as she attempted to smuggle methamphetamine into the United States. The **Target Device** is currently in the possession of the Department of Homeland Security. Since its seizure, the **Target Device** has been and currently is being held securely at the U.S. Customs and Border Protection Permanent Vault at 9495 Customhouse Plaza in San Diego, CA, 92154.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, there is probable cause to believe that a search of the **Target Device** will produce evidence of one or more of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my

1

review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause for the requested warrant.

## EXPERIENCE AND TRAINING

5.  I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

6.  I am a Special Agent (SA) with ICE-HSI and have been so employed since July 2018. I am currently assigned to the Deputy Special Agent in Charge, San Ysidro Office, Contraband Smuggling Group 2, and my duties include investigating the trafficking of illicit controlled substances; and the importation and distribution of illegal substances. I have training and experience in multiple investigative areas, to include conducting investigations and making arrests based on violations of Title 21, United States Code Sections 952, 960, and 963.

7.  I have had approximately 23 weeks of intensive training at the Federal Law Enforcement Training Center at Glynco, Georgia. These 23 weeks were comprised of approximately 12 weeks of the basic criminal investigator training program and approximately 11 weeks of HSI Special Agent Training. I have received training in identifying various controlled substances and conducting Title 21 controlled substances investigations.

8. Prior to working for HSI, I worked for the United States Border Patrol, San Diego Sector, Boulevard Station, for approximately ten years. My duties with the United States Border Patrol, as a Border Patrol Agent, were to detect, deter, and defeat criminal and terrorist activities, along with illegal immigration into the United States.

9. I have personally participated in and conducted investigations of violations of various State and Federal criminal laws, including those related to narcotics violations. I have arrested or participated in the arrest of persons for violations of the Controlled Substances Act. In these cases, I have conducted interviews with the arrested persons and their associates. I have conducted surveillance of narcotics trafficking as they conduct their activities while transporting narcotics in the United States. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics smugglers, and the structure of their narcotics smuggling networks.

10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers will use cellular/mobile telephones because they are mobile, and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e. Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational

3

status of checkpoints and border crossings.

 f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

 g. The use of cellular telephones by conspirators or drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

 a. tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

 b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers– used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

 c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

4

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

12. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Some of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

13. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico to the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. (I am also aware that such individuals will sometimes try to generate a history of crossings to show that driving through a POE is ordinary behavior for them.) When they arrive in the United States, smugglers will take the drugs to a discreet location to transfer them to other people involved in the distribution chain, who can then send the drugs to other locations for downstream distribution.

14. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that

drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that co-conspirators are often unaware when a fellow co-conspirator has been arrested and will attempt to communicate with that co-conspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

## FACTS SUPPORTING PROBABLE CAUSE

15. According to a report prepared by CBP Canine Enforcement Officer ("CEO") Olsen, on July 19, 2019, at approximately 7:35 p.m., HARO, a United States citizen, attempted to enter the United States from Mexico through the San Ysidro POE. HARO was the driver and sole occupant of a gold Volkswagen sedan bearing California license plate 6XEG561 (the "Vehicle"). CEO Olsen and his Human and Narcotics Detection Dog ("HNDD") were in pre-primary when the HNDD alerted to the trunk of the Vehicle. CEO Olsen obtained the Vehicle's keys from HARO. CEO Olsen opened the trunk of the Vehicle, and the HNDD alerted to the passenger side quarter panel. CEO Olsen radioed for assistance and informed the responding CBP officers of the HNDD alert.

16. According to a report prepared by CBP Officer Munoz, he was assigned that day to the San Ysidro POE Traffic Control position. At approximately 7:37 p.m., CBP Officer Munoz responded to CEO Olsen's request for assistance. CBP Officer Munoz questioned HARO as to her destination. HARO stated she was traveling to San Ysidro and had nothing to declare. CBP Officer Munoz handcuffed HARO then escorted HARO to the secondary security office.

17. According to a report prepared by CBP Officer Sanchez, he was assigned that day as the San Ysidro POE Z-Portal Non-Intrusive Inspection system operator. At approximately 7:45 p.m., CBP Officer Sanchez screened the Vehicle and noticed

anomalies inside the spare tire located on the trunk area, inside the rear seats, and within the rear quarter panels. CBP Officer Sanchez informed other CBP officers of his findings.

18. According to a report prepared by CBP Officer Godoy, she was assigned to the San Ysidro POE vehicle secondary lot and assigned the possible narcotics seizure from the Vehicle. Upon further inspection of the Vehicle, she discovered 49 packages containing a white, crystal-like substance wrapped in plastic throughout the Vehicle. She discovered 26 packages in the spare tire located in the trunk; 14 packages in the rear seats; five packages in the passenger side rear quarter panel; three packages in the air filter; and one package in the firewall. The Gemini Analyzer was used to test the white, crystal-like substance and it tested positive for methamphetamine. The 49 packages weighed approximately 23.42 kilograms (51.63 pounds).

19. I was notified of the event and responded to the San Ysidro POE. HARO was placed under arrest at approximately 8:45 p.m. CBP Officer Godoy seized the methamphetamine, the Vehicle, and the **Target Device**.

20. HARO was advised of her Miranda rights in the Spanish language. HARO waived her rights, and I subsequently conducted a recorded interview of HARO.

21. Post-Miranda, HARO claimed she did not know there were drugs in the Vehicle. HARO stated that she lives with her boyfriend, Arturo Valenzuela-Perez ("Valenzuela"). HARO stated that one night, she was with Valenzuela and his cousin, "Manuel," at a bar, and HARO overheard them talking about getting people to cross drugs into the United States. She stated that Manuel is from Culiacan, Mexico. HARO claimed that she was having vehicle problems and that Valenzuela told HARO he would fix her vehicle. Valenzuela took HARO's vehicle on Thursday, July 18, 2019, to a mechanic shop he owns to fix the vehicle. Valenzuela returned the vehicle to HARO on Friday, July 19, 2019.

22. HARO stated that on July 19, 2019, she and Valenzuela made plans to go to Magic Mountain. HARO stated that they went home to get some clothes because they

were going to stay in a hotel. HARO stated that while waiting in line in the Vehicle to enter the United States, Valenzuela claimed he forgot his Visa to enter the United States. Valenzuela then exited the Vehicle and told HARO that he was going back to retrieve his visa and would meet back with HARO in the vehicle line or in the United States at a friend's house.

23. HARO stated that she was going to a friend's house in the United States once she crossed the border. She said that her friend did not know she was on her way, and HARO did not know if her friend would be home when she arrived. HARO also stated she was suspicious when Valenzuela exited the vehicle because he forgot his visa.

24. HARO stated that she had a phone, but it stopped working. HARO stated that she purchased the **Target Device** before crossing into the United States.

25. I have reviewed the crossing history in the TECS system for the vehicle HARO was driving when she was arrested and determined that the vehicle has been crossing regularly into the United States (often multiple times in one week) since at least May of 2019. HARO also has frequently crossed into the United States as a pedestrian since at least April of 2019.

26. Given the facts surrounding HARO's arrest, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to believe that information relevant to the smuggling activities of HARO will be found in the **Target Device**. Such evidence, which could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data, is evidence:

    a. tending to indicate efforts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the

1  importation of methamphetamine or some other federally controlled substance from
2  Mexico into the United States;

3       c.    tending to identify co-conspirators, criminal associates, or others
4  involved in importation of methamphetamine or some other federally controlled substance
5  from Mexico into the United States;

6       d.    tending to identify travel to or presence at locations involved in the
7  importation of methamphetamine or some other federally controlled substance from
8  Mexico into the United States;

9       e.    tending to identify the movement of proceeds associated with the
10 trafficking of methamphetamine or some other federally controlled substance that was
11 imported from Mexico into the United States;

12       f.    tending to identify the user of, or persons with control over or access
13 to, the **Target Device**; and/or

14       g.    tending to place in context, identify the creator or recipient of, or
15 establish the time of creation or receipt of communications, records, or data involved in
16 the activities described above.

17    27.    Accordingly, based upon my experience and training, consultation with
18 other law enforcement officers experienced in drug trafficking investigations, and all
19 the facts and opinions set forth in this affidavit, there is probable cause to believe that
20 information relevant to the drug smuggling and trafficking activities of HARO, such as
21 telephone numbers, made and received calls, contact names, electronic mail (e-mail)
22 addresses, appointment dates, messages, pictures and other digital information are
23 stored in the memory of the **Target Device**. For the reasons set forth above, I request
24 permission to search the **Target Device** for items listed in Attachment B for the time
25 period from April 22, 2019 up to and including July 20, 2019, which was the day
26 following HARO's arrest.

## METHODOLOGY

28. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and/or serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## CONCLUSION

31. Based on all the facts and circumstances described above, there is probable cause to conclude that MARIANA HARO used the **Target Device** to facilitate violations of Title 21, United States Code, Section(s) 952, 960, and 963.

32. Because the **Target Device** was promptly seized during the investigation of MARIANA HARO's trafficking activities and has been securely stored since that time, there is probable cause to believe that evidence of illegal activities committed by MARIANA HARO continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from April 22, 2019 to July 20, 2019.

33. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the **Target Device** described in Attachment A, and to seize items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Edgar Aguirre
Special Agent
Homeland Security Investigations
Department of Homeland Security

Subscribed and sworn to before me this  day of August, 2019.

_____
The Honorable Andrew G. Schopler
United States Magistrate Judge

11